# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| WARREN A. VANDEVORT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | Case No. 6:13-CV-03453-NKL |

**ORDER**

Before the Court is Plaintiff Warren Vandevort's appeal of the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. [Doc. 19]. For the following reasons, the Commissioner's decision is affirmed.

**I.    Background**

Vandevort was born in 1964 and has a high school education. He alleges he became disabled on November 1, 2008. Vandevort first filed an application for disability benefits in February 2009. After a hearing in July 2010, [Tr. 33-57], an administrative law judge (ALJ) determined that Vandevort was not disabled, [Tr. 160-67]. Vandevort appealed that decision to the Appeals Council, and the Appeals Council issued a decision remanding the case for further consideration. [Tr. 171-75]. A second hearing before a different ALJ was held in July 2012, [Tr. 60-83], and that ALJ also determined that

1

Vandevort was not disabled, [Tr. 12-25]. The Appeals Council issued a decision denying Vandevort's request for review, and Vandevort initiated this appeal.

### A. Medical History

Vandevort alleges he is disabled from the combined effects of left shoulder impingement syndrome (status post-surgery), degenerative disc disease, low back pain radiating into the shoulder blades, right knee pain (status post-surgery), vision problems, tinnitus in both ears, migraines, difficulty with memory and concentration, mood swings, depression, and methamphetamine use in sustained remission. [Doc. 19, p. 8].

In June 2008, Vandevort underwent a CT after complaining of headaches and ringing in his ears. The CT scan was unremarkable. [Tr. 465-66]. Subsequent vision testing revealed that Vandevort has 20/50 vision in his right eye and 20/60 vision in his left. [Tr. 382-83]. A CT scan in 2009 was also normal, although bilateral ethmoid and left maxillary sinusitis had developed since the previous scan. [Tr. 445-46]. A study in August 2009 suggested that Vandevort had a central nervous system lesion. [Tr. 439]. He underwent a nasal septoplasty and bilateral inferior turbinate turbinoplasty in December 2009 for an obstructing nasal septal deformity. [Tr. 440-41]. In July 2011, he had 20/40 vision in his right eye and 20/50 vision in his left. [Tr. 691]. Vandevort was treated for hearing loss in February 2012. [Tr. 651-59].

Vandevort complained of left shoulder pain in October 2009. In September 2011, Vandevort was unable to lift his left arm above his head. [Tr. 699-701]. Vandevort underwent arthroscopic repair surgery in October 2011to correct an impingement. [Tr. 661-62]. The pain in his shoulder remained after the surgery, but at his hearing in July

2

2012, Vandevort testified that was some improvement post-surgery. He could not completely raise it over his head and he experienced pain in reaching, but he had no problems reaching away from his body to the front or to the side. [Tr. 64-65].

Vandevort also complained of low back pain. Views of his lumbar spine in May 2010 revealed no acute abnormalities and no significant degenerative disc disease. [Tr. 467]. Vandevort's treating physician also reviewed the x-rays and assessed degenerative disc disease despite also stating that his musculoskeletal system was normal upon examination. [Tr. 471]. At his hearing, Vandevort described the pain as a consistent five out of ten but stated that he had not discussed surgery or pain management options with his doctor. [Tr. 67].

Vandevort also has a history of pain associated with an ACL injury. He had ACL surgery several years prior. At his hearing, Vandevort stated that his knee hurts all the time, pops when he bends it, and swells during the day. [Tr. 65-66]. He rated his pain at a four or five out of ten. He stated that he had not discussed additional treatment for his knee. [Tr. 65]. Vandevort managed his back and knee pain with over-the-counter medication like Tylenol. [Tr. 68]. He testified that Tylenol usually reduces the swelling in his knee and dulls the pain in his back "a little bit." [Tr. 40, 68].

Vandevort also has a history of mental impairments that have been diagnosed as severe, recurrent major depressive disorder, anxiety, bipolar disorder, and aggressive behavioral disorder, with major depressive disorder being the most common diagnosis. Vandevort testified that depression sometimes affects his ability to sleep and eat. When

3

he is depressed, he has no energy, has difficulty concentrating, and is suspicious of others in crowds. He also avoids people because he "can't stand them." [Tr. 74].

In June 2009, a licensed counselor and social worked noted that Vandevort had never been seen for outpatient mental health services, but was experiencing depression following the death of his brother. [Tr. 476, 496]. A non-examining state agency consultant filled out a Psychiatric Review Technique after reviewing the available medical records, talking with Vandevort, and talking with Vandevort's father. The consultant noted that Vandevort reported little motivation, sleeping a lot, and difficulty maintaining concentration, persistence, and pace due to depression, but that these allegations were prior to Vandevort starting medication to stabilize his moods. [Tr. 397]. Vandevort's father reported that he saw Vandevort every two or three days, that Vandevort helped him with household chores, mowed his lawn, and ran errands with him. Vandevort reported to the consultant that he was taking care of himself. [Tr. 397]. After determining that Vandevort significantly improved after starting medication, the consultant opined that Vandevort had no limitations in activities of daily living, social functioning, or concentration, persistence, and pace. [Tr. 395].

In November 2009, Vandevort also underwent a psychiatric evaluation with Dr. David Fontaine, D.O. [Tr. 520-21]. Vandevort reported a depressed mood, excessive sleeping, decreased interest, low appetite, fatigue, and recurrent thoughts of death. [Tr. 520]. He was training a bird dog to occupy his time. *Id.* Dr. Fontaine stated that Vandevort had a neat and clean appearance, a bland affect, a neutral mood, had no psychomotor agitation or retardation, appeared to have coherent and goal-oriented

4

thought processes, showed no evidence of hallucinations or delusions, was not actively suicidal or homicidal, was oriented, had an intact memory, and had "quite good" insight and judgment. *Id.* Dr. Fontaine diagnosed Vandevort with severe, recurrent major depression with antisocial traits. [Tr. 521].

In August 2010, a counselor providing an assessment stated that Vandevort had "minimal hygiene," was cooperative, had normal speech and appropriate behavior, had thought processes within normal limits, was fully oriented and alert, had moderately impaired judgment, intact memory and concentration, was on task ninety percent of the time, and had a depressed mood. [Tr. 584].

Vandevort also attended regular therapy sessions with a licensed clinical social worker from July 2009 to July 2012. At the outset of his treatment, his mood was depressed and he regularly reported issues related to his brother's death. *See e.g.*, [Tr. 508, 518]. Throughout treatment, Vandevort reported going to church and to revivals and hunting, and expressed a desire to socialize, find a new girlfriend, and hunt with his dogs more often. [Tr. 518, 520, 522, 526, 544, 571, 574, 571, 579, 678, 684-86]. He also regularly expressed a desire to extensively clean his home. [Tr. 516, 524]. For example, in March 2009, he reported cleaning out fourteen bags of clothes. [Tr. 532].

However, Vandevort's counselors observed on multiple occasions that Vandevort's mood and depression depended on whether he had a girlfriend. [Tr. 672, 676]. For example, in November 2009, Vandevort reported meeting a new girlfriend at church and being very happy. [Tr. 518, 522]. In January 2010, he stated "I'm on top of the world right now." [Tr. 528]. His girlfriend was planning on moving in and a

5

wedding date was set. He reported that he was extensively cleaning his home, had no anger issues, continued to attend church regularly, and that thinking about his brother "hurts a little less than it used to." *Id.* In February 2010, Dr. Richard Aiken reported that Vandevort was "not doing very well currently" "primarily because of [a] situational issue concerning his upcoming marriage." [Tr. 530]. Dr. Aikin increased Vandevort's medication in light of the "obvious situational stressor on his engagement being on hold." [Tr. 531]. In March 2010, Vandevort had a depressed mood and reported continued difficulties with his girlfriend which ultimately resulted in them breaking up. [Tr. 532, 534, 536]. He had stopped cleaning his home, reported self-mutilating behavior and difficulty with his medication, his appearance was dirty, and he was having difficulty with anger management. [Tr. 536, 538]. In August 2010, Vandevort reported a desire to go on a singles cruise if he received disability benefits. [Tr. 579]. In September 2010, Vandevort reported that he was forming a friendship with a young woman. [Tr. 574]. His mood was "slightly improved." [Tr. 578]. He was sleeping better and was attending church. [Tr. 571]. In June 2011, he reported feeling happy and enjoying life depending on the circumstances. [Tr. 678]. He was going on a date with a new friend. He was alert and his grooming and hygiene were better. In August 2011, Vandevort reported sleeping without difficulty. He had gone on three dates with a friend. His mood was "so-so," and he was taking care of himself. [Tr. 676]. His anger was under control. *Id.* In May 2012, Vandevort reported some difficulty because he broke up with his girlfriend and had been off his medication for a couple of days. [Tr. 709]. In June 2012, he reported that his mood was worse because his ex-girlfriend was dating someone else. [Tr. 707].

Vandevort's therapy records also reveal that he is sometimes non-compliant with his medication and that his mood and depression get worse when he is off his medication. In April 2011, Vandevort reported being off his medication. Without medication, he did not sleep well, his mood was worse, and he appeared dirty. [Tr. 682]. In May 2011, Vandevort resumed his medication, appeared cleaner, slept better, and was in a better mood. [Tr. 680]. In August 2011, he reported that he had stopped taking his medications and that his depression got worse when he did so he restarted them. [Tr. 676].

### B. Medical Opinions

Vandevort received treatment from his family physician, Dr. David Dale, for approximately three years prior to his hearing before the ALJ. Dr. Dale submitted two Physical Medical Source Statements. [Tr. 501-03, 604-06]. In June 2010, Dr. Dale opined that Vandevort could lift five pounds frequently and ten pounds occasionally and stand, walk, or sit two hours in an eight hour day. [Tr. 501]. Vandevort could not perform repetitive pushing or pulling and could never stoop, kneel, crouch, or crawl. [Tr. 501-02]. He could occasionally climb, balance, and reach. He could frequently handle and finger, constantly feel, and had an unlimited ability to see, hear, or speak. He also had environmental limitations. Vandevort would need rest periods every thirty minutes and his work schedule would be disrupted four to eight times per month. [Tr. 503].

In May 2012, Dr. Dale opined that Vandevort could lift five pounds frequently and occasionally and stand, walk, or sit two hours in an eight hour day. [Tr. 604]. Vandevort could not perform repetitive pushing or pulling and could never climb. [Tr. 604-05]. He could occasionally balance, stoop, kneel, crouch, crawl, reach, and handle. He could

7

frequently finger, constantly feel, and had an unlimited ability to see, hear, or speak. He had environmental limitations. Vandevort would need rest periods every twenty minutes and his work schedule would be disrupted ten times per month. [Tr. 606]. Dr. Dale opined that Vandevort had "unpredictable behavior and balance issues" which led to the limitations Dr. Dale placed upon him. *Id.*

### C. The ALJ's Decision

After a hearing, the ALJ found that Vandevort suffered from the following severe impairments: left shoulder impingement syndrome (status post-surgery), depression, and methamphetamine abuse in sustained remission. [Tr. 15]. The ALJ concluded that Vandevort's complaints of lower back pain, vision impairment, hearing loss, and knee pain were not severe under Step 2 of his analysis. [Tr. 15-16]. The ALJ determined that Vandevort had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) with added restrictions due to Vandevort's left shoulder and psychological impairments. [Tr. 18]. Vandevort could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours in an eight hour workday, and sit for six hours in an eight hour workday. He was limited to work that involves only occasional overhead reaching and could perform work that involves remembering, understanding, and carrying out only simple instructions.

In making his conclusion, the ALJ pointed out that the opinions of Vandevort's treating physician, Dr. David Dale, D.O., were inconsistent with the objective medical evidence, inconsistent with Dr. Dale's own examinations of Vandevort, inconsistent with

Vandevort's course of treatment, and inconsistent with Vandevort's testimony at the hearing. [Tr. 21-21]. The ALJ assigned "little weight" to Dr. Dale's opinions.

The ALJ also remarked that Vandevort only took Tylenol to relieve pain and did not participate in a pain clinic or physical therapy. [Tr. 20-21]. The ALJ also found it significant that Vandevort stopped working either due to a car accident or due to drug use, but not because of any of his alleged impairments. [Tr. 20]. Vandevort's depression and mental impairments appeared to be largely situational and related to relationships with girlfriends. He was frequently non-compliant with his medication, he was able to attend church and initiate romantic relationships, and he had never been hospitalized or treated for acute symptoms of anxiety related to interacting with others. [Tr. 21-22].

At the hearing, a vocational expert testified that a person with the same age, education, work history, and RFC as Vandevort could perform jobs that exist in significant numbers in the national economy, including as a collator operator, inserting machine operator, and folding machine operator. [Tr. 81-82]. Based on this testimony, the ALJ concluded that Vandevort was not disabled. [Tr. 24].

## II. Discussion

Vandevort alleges the Commissioner's decision is not supported by substantial evidence because the Commissioner disregarded the opinions and findings of Vandevort's treating physician, Dr. Dale, failed to consider all of Vandevort's impairments in combination, erred in his analysis and credibility findings related to Vandevort's subjective complaints of pain, erred in finding that Vandevort retained the

9

Case 6:13-cv-03453-NKL Document 21 Filed 02/26/15 Page 9 of 17

RFC to perform a limited range of light work, and erred in finding that some of Vandevort's impairments were non-severe.

### A. Analysis of Treating Physician, Dr. Dale

Vandevort argues that the ALJ failed to properly consider the opinions and findings of his primary treating physician, Dr. Dale, and rejected most of the findings and conclusions contained in the Physical Medical Source Statements. "A treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). An ALJ may disregard or discount a treating physician's opinion where other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions. *Id.* In any case, the ALJ must provide good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *see also Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010).

The ALJ gave several reasons supported by substantial evidence in the record as to why Dr. Dale's opinions were due "little weight." First, the ALJ stated that Dr. Dale's opinions were inconsistent with the objective evidence. Specifically, the ALJ pointed out that the record only revealed degenerative changes in the shoulder prior to surgery. [Tr. 20]. Post-surgery, Vandevort stated that there was "some improvement" and that although it still hurt to reach over his head, he had no difficulty reaching away from his body to the side or front. [Tr. 64-65]. The ALJ accounted for this testimony by limiting Vandevort to only occasional overhead reaching. [Tr. 18]. As to Vandevort's complaints

10

of knee pain, low back pain, and degenerative disc disease, the ALJ remarked that no objective medical evidence existed to support the limitations opined by Dr. Dale. Images of the lumbar spine were unremarkable and revealed no significant degenerative disc disease. [Tr. 467]. Next, the ALJ stated that Dr. Dale's opinions were inconsistent with his own treatment records and examination findings. As the ALJ noted, there are relatively few remarkable findings related to Vandevort's musculoskeletal system in Dr. Dale's records. *See e.g.*, [Tr. 386, 450-62, 594, 597-99, 611, 626-29, 632-33, 642-44, 646]. There are occasional findings of decreased strength and range of motion, but those records rarely indicate whether the finding is related to Vandevort's back, knee, shoulder, or another body part. *See e.g.*, [Tr. 449, 611, 624-25]. The ALJ also remarked that Dr. Dale's opinions were inconsistent with Vandevort's course of treatment. [Tr. 21]. Vandevort testified that his back and knee pain were treated with Tylenol. [Tr. 65-69]. He had not discussed additional treatment for his knee or back pain with Dr. Dale. [Tr. 65, 68]. Lastly, the ALJ stated that Dr. Dale's opinion was inconsistent with Vandevort's hearing testimony. [Tr. 21]. While Dr. Dale opined that Vandevort was limited to lifting five pounds, standing continuously for thirty minutes, and sitting continuously for one hour, [Tr. 604-05], Vandevort testified he could lift twenty-five pounds once an hour, stand continuously for an hour, and sit continuously for two hours. [Tr. 69]. There are also numerous records where Vandevort disclosed that he was able to train a bird dog, hunt, haul bags of clothes out of his home and to a burn pile, clean his home, take care of himself and his father, do yard work, grocery shop with no physical problems, and drive a car without limitation. *See e.g.*, [Tr. 50, 63, 520, 524, 528, 532, 664].

11

Vandevort argues that the ALJ rejected Dr. Dale's opinion in favor of conclusions offered by non-treating, non-examining consultants "whose opinions at times were offered when they were not in possession of all of the medical evidence of record for their review." [Doc. 19, p. 34]. However, the ALJ does not discuss or give weight to any non-examining consultant regarding Vandevort's physical impairments. Further, Vandevort cites to no portion of the ALJ's opinion or the record to support this argument. Vandevort also argues that Dr. Dale's opinions are supported by and consistent with the medical evidence, but Vandevort cites to no specific examples to show how Dr. Dale's findings are consistent with the record and Vandevort's own testimony. Vandevort also argues that the ALJ substituted his own opinions for those of a licensed medical practitioner, but again, Vandevort points to no specific example of where this took place and does not explain how the ALJ's RFC determination is inconsistent with the record. Accordingly, the ALJ's determination that Dr. Dale's opinions were due "little weight" is supported by substantial evidence in the record.

### B. Consideration of Impairments in Combination

Next, Vandevort asserts that the ALJ failed to consider the effect of all of his impairments in combination. Particularly, Vandevort argues that the ALJ "neglected to discuss in any detail his allegations of low back pain, right knee pain, vision problems, tinnitus or difficulty with sitting, standing, and walking." [Doc. 19, p. 36]. To the contrary, the ALJ specifically discussed in length Vandevort's back pain, vision, tinnitus and hearing loss, and knee pain. [Tr. 15-16]. As to the back pain, the ALJ noted that Vandevort had not had extensive pain treatment and relied largely on over-the-counter

12

pain relief. Though Vandevort had some vision impairment, Vandevort was able to drive without difficulty and had poor vision while previously maintaining employment. *See Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011)( "A condition that was not disabling during working years and has not worsened cannot be used to prove present disability."). As to his hearing loss, while the ALJ acknowledged that it was mild to severe, the ALJ noted that Vandevort was able to hear without issue during the hearing and that no physician had limited Vandevort's ability to work due to the hearing loss. Vandevort's treating physician, Dr. Dale, opined in both Medical Source Statements that Vandevort was unlimited in his ability to see and hear. [Tr. 502, 605]. Finally, the ALJ remarked that Dr. Dale had only made vague musculoskeletal findings of decreased strength and range of motion and that Vandevort was able to control his pain with over-the-counter medication. By discussing each of the Vandevort's impairments, the ALJ sufficiently considered Vandevort's impairments in combination. *See Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011) (concluding that the ALJ's synopsis of the medical records and discussion of each of the alleged impairments was evidence that the ALJ properly considered the combined effects of the claimant's impairments).

Vandevort also argues the ALJ disregarded Vandevort's diagnoses of degenerative disc disease, osteoarthritis, back pain, sciatica, neck pain, vision problems, sinus problems, hearing loss, tinnitus, imbalance, facial pain, hyperlipidemia, bipolar disorder, and behavioral disorder. Several of these diagnoses – back pain, vision problems, hearing loss, and tinnitus – were discussed by the ALJ (see discussion above). As to the other diagnoses, Vandevort points to no evidence that these diagnoses were consistent,

13

does not explain how these diagnoses affect his ability to work, and points to no opinion within the record that suggests these diagnoses limit his ability to work.

### C. Credibility Analysis

Vandevort also contends that the ALJ rejected his subjective allegations of pain and offered no explanation for why he found Vandevort's testimony not credible. However, the ALJ provided several reasons for why he did not find Vandevort's subjective complaints of pain to be entirely credible. For example, the ALJ noted that Vandevort's course of treatment for his back, shoulder, and knee pain was conservative. [Tr. 20, 65, 68]. He did not participate in post-surgery therapy for his shoulder, did not require follow-up visits with his surgeon, and used only over-the-counter medication for pain relief. Vandevort also described his pain at a consistent five out of a ten point scale and said that Tylenol dulled the pain. [Tr. 68]. The objective medical records, discussed above, also did not support the level of pain alleged. The ALJ also observed that Vandevort's complaints were inconsistent with his activities of daily living. [Tr. 20]. He was able to clean his house, help take care of his father, train a dog, hunt, and work in his yard. [Tr. 20, 50, 63, 520, 524, 528, 532, 664]. The ALJ stated that while Vandevort had a steady work history, he testified that he stopped working as a result of either a car accident or to seek treatment for substance abuse. [Tr. 20]. The ALJ found it significant that Vandevort did not stop working due to a physical impairment. *Id.*

As to Vandevort's alleged mental impairments, the ALJ noted that Vandevort's depression was largely situational and revolved around whether he was in a relationship. [Tr. 21]. This observation is consistent with the record and with the opinion of

Vandevort's mental health providers who opined that Vandevort was often better when he was in a relationship. [Tr. 672, 676]. The ALJ also remarked that Vandevort did not always comply with his medication and that the records revealed a negative change in his mood when he did not do so. [Tr. 21, 676, 682]. The ALJ stated that Vandevort regularly attended church services, including revivals, and had success meeting women and initiating relationships. [Tr. 22, 508, 510, 518, 678]. Vandevort expressed a desire to meet people and despite testifying that crowds made him nervous, he previously told his counselor that he wanted to use Social Security benefits to pay for a singles cruise. [Tr. 579]. The ALJ gave several reasons, supported by substantial evidence in the record, for why he found Vandevort's testimony not completely credible. Where the ALJ did find Vandevort's complaints to be credible, the ALJ accounted for the complaints in the RFC. The ALJ limited Vandevort's overhead reaching abilities and limited him to tasks that involve remembering, understanding, and carrying out only simple instructions. [Tr. 18].

### D. RFC Determination that Vandevort Could Perform Light Work

Next, Vandevort argues that the ALJ's determination that he could perform light work is not supported by medical evidence. However, as discussed above, the ALJ relied on the relatively unremarkable medical findings, Vandevort's conservative treatment, his own testimony, and his reported ADLs to determine that he was capable of light work. Vandevort cites to no specific examples – other than Dr. Dale's opinions in the Medical Source Statements, discussed above – of how the medical evidence does not support a finding that he can perform light work. Vandevort also argues that there is no evidence in the record which contradicts Dr. Dale's opinions related to his RFC. However, Dr.

15

Case 6:13-cv-03453-NKL   Document 21   Filed 02/26/15   Page 15 of 17

Dale's opinion is contradicted by his treatment notes, the medical examinations and findings, Vandevort's course of treatment, his testimony, and his activities of daily living.

Vandevort also argues that the RFC does not take into account Vandevort's non-exertional impairments such as major depressive disorder. The ALJ provided several reasons why, although severe, Vandevort's major depressive disorder did not cause more impairments than accounted for in the RFC. The ALJ pointed to Vandevort's desire to socialize, his ability to initiate relationships, the situational nature of his depression, and the helpful effects of medication. Vandevort points out that he was assigned multiple global assessment functioning scores below 50, indicating serious difficulties in functioning. The Eighth Circuit, citing the DSM-IV, has previously stated that GAF scores below 50 are an indication of serious symptoms and a serious limitation on a claimant's ability to perform basic life tasks. *See Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009). However, the DSM-V, released in 2013 and replacing the DSM-IV cited by the Eighth Circuit, no longer uses GAF scores to rate an individual's level of functioning because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." *See Rayford v. Shinseki*, 2013 WL 3153981, at *1 n. 2 (Vet. App. 2013) (quoting the DSM-V). Further, other evidence in the record is inconsistent with a GAF score indicating serious limitations on the ability to function. *See Wright v. Astrue*, 489 Fed. Appx. 147, 149 (8th Cir. 2012) (failure to discuss GAF scores did not require reversal given ALJ's comprehensive analysis of the medical evidence, the infrequency of the GAF scores, the range of the GAF scores, the claimant's conflicting activities, and the

conflicting medical evidence); *Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010). The ALJ's RFC determination is supported by substantial evidence in the record.

### E. Analysis of Severe Versus Non-Severe Impairments

Lastly, Vandevort contends that the ALJ erred by finding that his vision loss was non-severe. Vandevort contends that the ALJ did not give proper consideration to his vision limitations and should have presented a hypothetical to the vocational expert with vision impairments. However, the ALJ provided specific reasons for why Vandevort's vision loss was not severe. The ALJ noted that Vandevort was able to drive without any limitation and that he has been able to work in the past with poor vision. [Tr. 15]. Further, Vandevort points to no evidence in the record suggesting that his vision limits his ability to work. *Contra* [Tr. 502, 605]. At his hearing, Vandevort testified that he spent much of his time watching television or movies, an activity inconsistent with an allegation that vision loss would prevent him from working.

The ALJ's RFC and credibility determinations as well the weight given to Dr. Dale's opinions are supported by substantial evidence in the record. Accordingly, the Commissioner's decision denying disability benefits is affirmed.

### III. Conclusion

For the reasons set forth above, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: February 26, 2015
Jefferson City, Missouri